### THE MASCOTTE.

### DEVENNY et al. v. THE MASCOTTE.

(District Court, D. New Jersey. June 18, 1895.)

1. COMPROMISE—PARTIAL SETTLEMENT—EVIDENCE.

The charterers of a tug, after paying the first month's hire, refused to pay further, because of numerous breakdowns, causing delay and damage in their business. They also sent a memorandum of such claims, with bills for repairs, to the owners. This led to an interview resulting in a settlement, whereby the charterers paid a considerable sum to the owners, while the latter agreed to allow and pay a large bill for repairs, and perhaps some claims for delays; and thereupon a new contract of hiring was made, materially modifying the original one. *Held*, that it was extremely improbable that any claims accruing prior to the settlement were not included in it, and that on the evidence the settlement must be considered as in full to date, so as to bar all prior claims of the charterers.

2. BREACH OF CHARTER PARTY—EXEMPLARY DAMAGES.

The forcible retention of possession of a tug by her charterers after breach of their contract is not a ground for exemplary damages, where they act under legal advice; and the damages for the detention must be measured by the charter rate.

This was a libel by John J. Devenny and others against the steam tug Mascotte to enforce certain claims for damages, and for repairs. A cross libel was filed by the owner of the tug, setting up claims for various items alleged to be due from the charterers.

Flanders & Pugh, for libelants.

Henry M. Snyder, Jr., for respondent.

GREEN, District Judge.   About June 1, 1890, the libelants chartered the tug Mascotte, then lying at Perth Amboy, N. J., for a term

of six months, with the privilege of renewal at the rate of $10 per day. The contract of hiring was made with one S. B. Greason, who was a duly-accredited agent of the owner, Dr. John C. L'Engle. Dr. L'Engle was a resident of Florida. It seems from the testimony that, while the libelants made a personal examination of the tug before chartering, they were assured by Mr. Greason that she was practically a new boat in every part, was in good order, and was fitted for a tug. The charter party describes the tug as "tight, staunch, strong, and every way fitted for the service" to which she was destined. Hardly had the libelants taken possession of the tug before defects became manifest, or she was subject to a series of accidents which seem to be unusual, and which succeeded each other with considerable regularity. These necessitated repairs, caused delays, and interfered apparently with the financial success of the operation of the tug. In fact, the libelants allege that they have suffered heavy pecuniary loss, and it is to recoup themselves for such loss that this libel has been filed.

In the view which I take of this case it is not necessary to discuss the character or legal effect of the instrument executed by the libelants and Mr. Greason as agent for the owner,—the so-called "charter party,"—nor whether the descriptive statements of the tug, therein contained, are warranties. The parties have construed the contract for themselves, and I shall not dissent from their construction. It appears in evidence that after making the first payment for the use of the tug, and covering the first month of the hiring, the libelants refused or declined to pay any more to the owner, alleging that they had an offset in the nature of repair bills and claims for enforced delays. Demand for accrued hire being made upon the libelants, they responded by letter, in which they say, as an excuse for their failure to pay, as follows: "We have been at considerable loss in the time of our barges and wages, etc., of the crew of the Mascotte." And they inclosed a memorandum of their alleged claims for delay and bills for repairs. This letter and claim seem to have been the means of bringing about an interview between the parties in Philadelphia, and finally, on or about the 1st of October, 1890, a settlement was reached. It was insisted upon the argument on behalf of the libelants that this settlement was only a partial one. But I think the weight of testimony sustains the contention of the respondent that it was a full settlement of all demands up to the date when it was made. It can hardly be conceived that the libelants, if they had other claims pending against the Mascotte, should have willingly paid moneys to her owner. And yet it is not denied that they did pay to Dr. L'Engle, as a settlement of his claim, the sum of $342.22, while the owner agreed to allow and pay a large bill incurred for repairs, and perhaps some claims for delays. That all the claims which the libelants could have under the first hiring were then settled seems to be still further proved by the fact that a practically new arrangement for the use of the Mascotte was then made between the parties. In two respects the original agreement was changed,—the crew were no longer to be paid by the libelants, as was originally provided, but by the owner, and the term was liable to be ended by notice from the owner. It does not seem probable that such material changes in the original contract should have been assented to by the

libelants if they had claims for damages yet unsettled arising under it. I am constrained to find that the settlement of October 1, 1890, was in full to that date, and is a bar to any claim which predates that time. I cannot find any proof that after that date any claim for damages or repairs accrued to the libelants. It is true that one of the libelants testifies that of the 43 days which it is claimed the tug was unusable because of its unseaworthy condition at least 23 were after the settlement, but no dates or causes of delay are given. If that statement is correct, it is evident that the tug must have been out of service nearly the whole of October. But the remaining testimony does not justify such inference. On this point of the case I shall refer it back to a commissioner, if libelants so desire, for more direct and positive testimony. The remaining claim is for loss of anticipated profits on what is called the "Wilmington" contract. It is extremely doubtful if the circumstances of this case warrant the finding of consequential damages. At any rate, the evidence now before the court does not justify any such award. It is extremely unsatisfying, vague, and indefinite, and does not, as it appears, support the contention of the libelants.

The respondent has filed a cross libel, claiming various items, amounting to $1,368.17, as due from the firm of Devenny & Co. It is only necessary to refer to one of these,—a charge of $25 per day for the tug from November 10th to December 17th, amounting to $950. It appears that in accordance with the provisions of the amended contract of hiring, on the 9th day of November, Dr. L'Engle's agent served a notice upon the libelants, terminating the term for failure to comply with the conditions of the charter. That the libelants were in default in payment of hire of the Mascotte is not disputed. Such default gave the owner of the tug the right to cancel the contract of hiring. The due service of the notice is not disputed. In breach of their contract, Devenny & Co. by force kept possession of the tug until December 17th. But this they did under legal advice. This is no case for exemplary damages. I think that the claim of $25 per day for the tug is not justified, but that the damages sustained by the owner through this illegal detention will be properly measured by the charter rate of $10 per day, and for such sum it is allowed. The other items of the claim, I believe, are not disputed. Of course, the charge of $67.62 for legal expenses is disallowed.